5bu 47
113 950

CASE 8—PETITION EQUITY—APRIL 16.

## E. Martin vs. W. Martin, &c.

## A. D. Martin vs. E. Martin, &c.

## Same vs. M. Beckly, &c.

APPEAL FROM WOODFORD CIRCUIT COURT.

1. "When a deed shall be made to one person, and the consideration therefor shall be paid by another, no use or trust shall result in favor of the latter." (Sec. 20, chap. 80, Rev. Stat., 2 Stant., 230.) This section changed the law as to resulting trusts, but it does not apply to conveyances made before the Revised Statutes took effect.

2. When a deed was made before the Revised Statutes took effect, conveying land to one person, and the consideration therefor was paid by another, a trust resulted in favor of the latter, and that trust may be enforced.

3. If a conveyance is made with intent and to the effect of delaying creditors, it is fraudulent, and in such cases both parties being in fault, or in pari delicto, the courts hesitate to grant either relief, and refuse to have anything to do with the case; but if no fraud is perpetrated upon the creditors, then this principle does not apply, and the party receiving the conveyance must hold it according to the original trust, or he must pay for it.

E. Martin vs. W. Martin, &c.

4. If one party should accept a deed for land at the instance of another who has paid the consideration, although the policy of the statute forbids a resulting trust in the land, its object was not to enable one party to rob another, of his substance, by undertaking a trust that the law would not enforce, and, at the same time, refuse to execute the trust or to return the money.

In case of such refusal, a recovery may be had against the party who receives the title, on the implied promise, *raised by law*, to refund to the party paying for the land, the money laid out and expended by his consent; for when he receives the title, he shall thereby be presumed as consenting to the expenditure for his use.

PORTER & GREATHOUSE and

T. N. & D. W. LINDSEY,    For Appellant, Elijah Martin,
                  CITED—
*Revised Statutes, sec. 20, chap. 80.*

HUNT & BECK and

A. J. JAMES,                          For Ann D. Martin,
                  CITED—
6 *B. Mon.*, 106; *Brothers vs. Porter.*

2 *Sugden on Vendors*, 908 *to* 913.

*Rev. Stat.*, sec. 14, chap. 21, 1 *Stant.*, 262, *and secs.* 20, 22, *chap.* 80.

3 *Metcalfe*, 169; *Graves vs. Graves.*

1 *Bibb*, 609; *Snelling vs. Utterback.*

3 *Bibb*, 15; *Stevenson vs. Stevenson.*

3 *Bibb*, 502; *Hart's devisees vs. Hawkins' heirs, &c.*

1 *Marshall*, 46; *Perry's heirs vs. Head.*

3 *Marshall*, 24; *Fish vs. Dumarsley.*

3 *Marshall*, 477; *Deatly's heirs vs. Murphy.*

4 *J. J. Mar.*, 592; *Letcher vs. Letcher's heirs.*

CHIEF JUSTICE WILLIAMS DELIVERED THE OPINION OF THE COURT:

The ancestor of these parties, Wm. Martin, sr., died in the year 1836 intestate, leaving a small estate of only eighty acres of land and some personalty to descend to

E. Martin vs. W. Martin, &c.

his twelve children and surviving widow. James Martin, one of the heirs, died intestate, never having married, and his share descended to his mother, brothers, and sisters. The mother subsequently died, and her interest descended also to the eleven surviving children.

Telitha and her husband, Joseph Martin, had her interest separated, which they afterwards sold to J. R. Thompson, reducing the tract to seventy-three acres, two roods, and sixteen poles, held then jointly by ten children in coparcenary.

In the year 1837, William Martin purchased the share of his sister, Mrs. Stockdell, and took the bond of her and her husband. He paid her two hundred and thirty-three dollars, and there remained unpaid sixty-seven dollars; and had the deed made to Elijah for it in 1854.

In the year 1848, William Martin also purchased of his sister, Mrs. McAfee, her interest in said land, and took her and her husband's deed therefor, which, being informally acknowledged, was not put to record.   .

It is charged that Elijah got this deed in the year 1861 from William, under pretence of having it properly recorded, and that he could get the clerk to strike out the word " dower" in the certificate, and insert " inheritance;" but that, instead of doing so, he struck out said word· " dower" himself and inserted " inheritance;" also struck out William's name as a grantee, and inserted his own. It is sufficiently established that both alterations are in his handwriting, and that the deed was, thereupon, put to record without any subsequent acknowledgment or consent by the grantors.

In 1848, William Martin also purchased the interest of his brother Hugh, at three hundred dollars, and paid all but one hundred and twenty-three dollars. This he claims he paid by procuring the release to Hugh by his

VOL. v—4

mother, brother John, and sister Jane McClanahan, of their interest in the slave estate of his brother James, who had died in Missouri, and of whose estate Hugh Martin was the administrator. The deed for this share was made in 1848 by Hugh to Elijah and John Martin, at William's instance and request.

As one of the twelve children had died and another had her share partitioned, this seventy-three acres, two roods, and sixteen poles remained to ten coparceners, and they held by undivided tenths; William claiming to be beneficially the owner of his own, and by purchase from his coparceners of the shares of Mrs. Stockdell, Mrs. McAfee, and his brother Hugh, thus making him the owner of four tenths of the said tract.

Elijah Martin had purchased the interest of his sister, Mrs. McClanahan, and her husband, and of his brother Washington Martin, and his sister Martha and her husband, James Martin, thus making him the owner, by inheritance and as purchaser, of four tenths.

Ann D. Martin still owned her share so inherited, being one tenth.

John Martin had never sold his interest, consequently, when he died it descended to his heirs, Mrs. Beckly and her brother, Wm. H. Martin, thus making the remaining one tenth.

In this controversy Elijah claims to own the interests of Mrs. Stockdell and Mrs. McAfee, and half of Hugh Martin's interest, which William claims; and Mrs. Beckly and her brother, heirs of John Martin, claim to own half of Hugh Martin's interest, which William claims, as having been purchased by him, but conveyed, at his instance, to Elijah and John Martin.

Elijah, John, William, and Ann D. Martin continued to keep their property together, without separation, on the

old homestead, and lived in common and farmed together without any articles of agreement, or seemingly well-defined understanding or book of accounts, for about ten years, when, in the year 1858, they exchanged this seventy-three acres, two roods, and sixteen poles to Oneal for a farm of one hundred and seventy-three acres, putting in the old homestead at acre for acre for the Oneal land, and paying at the time two thousand dollars, and executing a note for three thousand nine hundred and sixty-four dollars, payable March 1, 1860.

The deed, by direction of the parties, was made to Elijah, John, and Ann D. Martin, and the note signed by them without William's name in either, although he participated in the trade, and his interest by inheritance, as well as by purchase, went in as payment. The note was paid, and soon thereafter, some time in the year 1860, dissensions arose between these survivors, John having in the meantime—between January and March, 1860—died. The consequence was, Elijah forcibly took exclusive possession of the dwelling-house and about one hundred and thirty acres of the contiguous land, leaving to William and Ann D. Martin only about forty-three acres, which William continued to occupy until the bringing of this suit, July 20, 1860; also personalty of different kinds; when Elijah Martin brought this suit seeking partition of the land, claiming that the parties were to own the Oneal tract just as they had owned the old homestead, and in the same proportions; and that he owned of that thirteen twentieths, or six and one half tenths; that the remainder had been paid for out of their joint property. He asks that the joint personal property on hand be sold, and the proceeds divided; and that if the land cannot be divided according to the parol agreement, then that an account of purchase money be taken, and be adjudged against the others any surplus which he may have paid.

William Martin transferred, without recourse, all his interest in the property to his sister Ann.

Ann D. Martin set up her own interest by inheritance and her brother William's, both by inheritance and purchase, which she claimed to be one tenth in his own right, the whole of Mrs. McAfee's interest, a part of Mrs. Stockdell's interest, as two hundred and thirty-three dollars, which William paid her, is to sixty-seven dollars, which Elijah paid her; and of Hugh Martin's interest, it being paid for wholly by William and John and their sister, Jane McClanahan, and mother, Letitia Martin, as follows: John Martin paid forty-one dollars, Jane forty-one dollars, and Letitia forty-one dollars, and William one hundred and seventy-seven dollars.

She charges that she, her sister Jane, and brothers William and Elijah, lived and worked together on the old homestead until 1849 or 1850, when Elijah was taken sick, and continued in bad health for a long time. When he recovered, which was not until 1851, he withdrew his part from their accumulated fund of one thousand six hundred dollars, some five hundred and eighty dollars, and then commenced trading solely for himself, but kept his stock on the place, and fed it and prepared it for market, and did but little or no labor himself; but in this way getting more than he was entitled to from said place, up to March 1, 1858, when they went into possession of the Oneal place. That Elijah borrowed from her and William three hundred dollars, August 29, 1855, for which he executed a note to William; that in September, 1856, he borrowed from them two hundred dollars, and in September, 1857, he borrowed two hundred dollars more, for neither of which sums he executed his note.

She also charges, that, in the purchase of the Oneal farm, it was expressly agreed between her and Elijah, and John and William, that each were to have and hold an interest therein in amount as severally paid by them, including the proportion that each owned and had paid in the old homestead place. That Elijah paid no part of the two thousand dollars, nor the deferred payment of three thousand nine hundred and sixty-four dollars; that by agreement of all parties the deed was made to her, Elijah, and John. She denies Elijah's interest in the stock and personalty on hand; alleges that he all the time had exclusive possession of twenty acres of the Oneal farm; had pastured his stock on said farm, and had thus annually received more than the profits of his interest therein.

She charges, that, after bringing said suit, about the first of the year 1861, Elijah, by violence and threats, expelled her and William from the dwelling, forcibly took possession of it and much of their personalty, corn, &c., and had kept exclusive possession of one hundred and thirty acres of the farm ever since.

The cause was referred to the master commissioner, who has made an intelligent and business-like report, presenting four different views.

As the facts are exceedingly complicated, involving, as they do, some rather uncommon and abstruse propositions of law, it is not at all strange that the master should not, in either view, have exactly presented the true legal status of the case. The court adopting neither, has, we think, equally erred in its judgment.

The first question, which lies at the base of all the rights of William in this Oneal land, is, whether the conveyances to Elijah and to him and John jointly were fraudulent, and made to prevent his creditors from

collecting their debts? Secondly, whether he is prevented from claiming a resulting trust because of *section 20, chapter 80, 2 Stanton's Revised Statutes, 230.* William never did convey, or in any manner encumber, his tenth interest in the old homestead place derived by inheritance; therefore, it was at all times subject to sale by his creditors, but seems never to have been done; and whatever may have been the seeming and ostensible motive for such conveyances, it is not apparent in this record that any delay or defeat of his creditors did occur, and, therefore, no actual fraud was perpetrated.

If a conveyance is made with intent and to the effect of delaying creditors, it is fraudulent; and in such cases both parties being in fault, or in *pari delicto,* the courts hesitate to grant either relief, and refuse to have anything to do with the case; but if no fraud is perpetrated upon the creditors, then this principle does not apply, and the party receiving the conveyance must hold it according to the original trust, or he must pay for it.

We think there is no sufficient fraud made out in this case to defeat William, and unless this was done to vindicate innocent creditors, or to sustain a public policy, no court of conscience would sustain, on the part of a vendee, so immoral a plea and defense.

*Section 20, chapter 80, 2 Stanton's Revised Statutes,* provides, that "when a deed shall be made to one person, and the consideration therefor shall be paid by another, *no use or trust shall result* in favor of the latter."

By *section 14, chapter 21, 1 Stanton's Revised Statutes,* 262, it is provided, that "no part of this reversion is retrospective unless expressly so declared."

These Revised Statutes unquestionably changed our laws as to resulting trusts, as no such statutory provision had previously existed; but resulting trusts, as recognized

in the equitable jurisprudence of the country, uncontrolled by statute, in this particular were fully recognized in this State.

The deed of McAfee and wife, first to William Martin, but afterwards his name erased by Elijah and his own inserted, bears date June 29, 1844, before our Revised Statutes were enacted, and, therefore, not to be controlled by them. So even had this interlineation and erasure been authorized by the parties, yet, as William paid the purchase price, as is abundantly established, there would have resulted a trust from Elijah.

The deed of Hugh Martin to Elijah and John Martin is dated June 23, 1848; and as it is clearly established that William paid of the consideration of three hundred dollars at least one hundred and seventy-seven dollars, there resulted to him a trust to that extent, and perhaps more; for whether he was entitled to the whole paid by his mother and sister Jane of forty-one dollars each, or only a portion, does not so explicitly appear; but, so far as these were paid on his account, or he may have an interest therein, a trust also resulted to him.

Stockdell and wife sold to him previous to the year 1850, and before our Revised Statutes went into operation; but their deed to Elijah is not dated until August 31, 1854. Whether this bond was transferred by William to Elijah in trust for him previous to the year 1850, or indeed at all, does not appear. The dates of the conveyances of the other purchases made by William in some degree raises the presumption that the bond was so transferred before the year 1850; if so, a resulting trust was created, which could not be destroyed by the subsequent conveyance taken in pursuance thereof. But if the bond was transferred in trust before the deed was made, this created a trust which Elijah must execute; and

William's rights as to it does not depend upon whether a trust resulted from the conveyance of Stockdell and wife to Elijah. But if the bond was not so assigned, and the conveyance was made after the Revised Statutes, as it is evident that William paid two hundred and thirty-three dollars and Elijah only sixty-seven dollars of this purchase, is Elijah to have the land and not refund to William the money expended by him?

In the case of *Montague vs. Garnett* (3 *Bush*, 298), this court held, that a recovery could be had upon the implied promise, *raised by law*, when a party had received money or goods, &c., upon an express promise which came within the statute of frauds and perjuries, and could not therefore be enforced—drawing a distinction between a promise to return money loaned to be bet at cards, which the statute declares void, and a virtuous and valuable consideration advanced upon a contract which the law, from public policy, requires to be in writing, and if not, will not enforce it, in which case the party refusing to execute the contract *is made by law to promise a return*.

So in case one party shall receive a deed at the instance of another, who has paid the consideration, although the policy of the statute forbids a resulting trust in the land, its object was not to enable one party to rob another of his substance by undertaking a trust that the law would not enforce, and at the same time refuse both to execute the trust or return the money.

It neither conflicts with the policy of the statute nor its integrity of purpose to require a party thus receiving a title to refund to the party paying for the land the money thus laid out and expended by his consent; for when he shall receive the title, he shall thereby be presumed as consenting to the expenditure of the money for his use. It would hence result, that if there was a previous trust

as to this interest undertaken by Elijah for William Martin before the operation of the Revised Statutes, or before the conveyance, it should be executed; if not, then Elijah should be required to answer for the money so expended by William.

The evidence and circumstances, especially the note executed by Elijah to William dated in 1855, indicates that Ann D. Martin gave a true version as to when the partnership ceased, and its causes therefor, to-wit, in the year 1851; and that from that time Elijah ceased to have any interest in the joint products of Ann, John, and William, but still enjoyed his interest in the land by way of pasturage, feeding his stock, &c., keeping his interest in personalty separate. If this be so, he paid no part of the two thousand dollars, nor of the note for three thousand nine hundred and sixty-four dollars; for he only sets up payment by himself of his interest in the joint property paid, and the means by which these payments were made. The presumption of law is, that joint vendees hold by equal portions, unless otherwise expressed in the deed; but this may be rebutted by evidence showing that they hold by unequal portions; for this does not contravene the deed. All the vendees are invested with the title, but in what proportions the deed does not express. The presumption in such cases is, that they hold equally; but it may be shown otherwise, as that one has paid more and another less of the purchase price, and hence hold in such proportions. This being so, Elijah held in the Oneal farm his one tenth inheritance in the old homestead, and, as vendee in his own right, the interest of his sisters, Jane McClanahan and Martha Martin, and his brother Washington Martin, therein, and a fraction of Mrs. Stockdell's interest, under any circumstances, he having paid sixty-seven dollars on it; and perhaps he

may be entitled to the remainder thereof, on refunding William's outlay therefor. This is all the payments he seems to have made in the Oneal farm on his own account, and of his own means.

Now, as this title was derived after the enactment of the Revised Statutes, and by consent of all the parties, does the statute prevent a resulting trust in this Oneal farm as to William?

This question is the more complicated because he then held certain interests paid for by William, as to which there was a resulting trust, as before explained; but as to William's own inherited interest, there had been no previous trust, and it was now, for the first time, conveyed in part payment of the Oneal farm; and so far as it is concerned, it is certainly within the provisions of the statute, and no resulting trust would have attached by operation of law; but Elijah claims in the Oneal land only according to his holding in the old homestead, and as it is certain he did not hold therein William's inherited tenth, he can not hold any part of the Oneal land paid for by it; and as the title of the other portions which William had purchased, and which had been conveyed to Elijah, was already in him, and subject to be sold and conveyed by him, it cannot, in the true spirit and meaning of the statute, be said to have been paid by William, and the deed by his consent taken to Elijah; but as to these, the original status of the parties must be considered as still existing, and their rights accordingly adjudicated.

As to the difference paid between the two places, so far as it caused an outlay of William Martin's means, the law would raise no resulting trust from the three vendees of Oneal, and they would owe to William, or his assignee, Ann D. Martin, the amount so expended

by him; but in their pleadings they only assert an interest in the Oneal land equal to what they held in the old homestead, and according to their subsequent payments; hence, they can be allowed an interest only so far as they held in the old homestead, and made actual payments of the difference between the two places; this, therefore, will leave to Ann D., as assignee of her brother, all the land which Elijah and John's heirs are not entitled to.

Elijah Martin must be held responsible for the entire amount of the three hundred dollar note, and such of the alleged borrowed sums of two hundred dollars each, as the evidence establishes; and this without allowing him any interest therein. He must also be held for the reasonable rents of the place, with interest on the annual value from the time he took violent possession thereof, deducting for such lasting and valuable improvements as he may have made. He must be regarded as having no interest in the personal property, and held for the reasonable value of such as he forcibly possessed and used; and to his sister, Ann D. Martin, for such of her individual stock as he got and used; and for all other personal liabilities which have been manifested against him; and his interest in the land should be held responsible for any balances found against him.

No rents or use will be allowed to either party as balance up to the forcible and unfriendly expulsion of Ann D. and William from the dwelling, &c., in the year 1861. The land will then be partitioned, giving Ann D. her payment of one tenth inherited, and William one tenth inherited, and his purchases from Mrs. McAfee; and so as to Hugh Martin and Mrs. Stockdell, so far as the same shall be manifested in the old homestead; and then two thirds, the balance paid as difference between

the places, provided that it be shown that John Martin's heirs paid their portion of this; but if not, then she will be entitled to land for this outlay, as Elijah paid nothing on it. She will also be entitled to recover for William's outlay in this farm, whether for Mrs. Stockdell's interest, or for the amount otherwise paid for which she may not get land.

Elijah will be entitled to his tenth inherited, and as purchaser from his sisters, Jane McClanahan and Martha Martin, and brother Washington Martin, and his fractional interest of sixty-seven dollars in Mrs. Stockdell's interest in the old homestead; and if the resulting trust, nor created trust, can be enforced as to the balance of her interest, he will also be entitled to it, answering for William's outlay of two hundred and thirty-three dollars; and then for that part of William's outlay otherwise, so far as he gets land by reason thereof, as he may be held responsible therefor.

John Martin's heirs will be entitled to his tenth inherited, and his forty-one dollars paid to Hugh Martin towards his interest, and such other portion of the forty-one dollars paid by their mother and sister Jane McClanahan as they may manifest; and Elijah will also be interested in the land as to so much of these latter two sums as he may manifest an interest in.

Ann D. Martin will be entitled to all the interest of her brother William in and to the land, and any judgment for money which may be rendered which he would be entitled to but for his said assignment to her.

On a return of the case, the court will again refer it to a master commissioner to ascertain the various and complicated interest of these parties, upon the basis of this opinion, with leave to either party to introduce evidence to establish and elucidate any point of difficulty

herein suggested, and to report the proof, with the interest of each in the land, and a complete balance sheet; so that, after final adjudication, the court can, through a commissioner, have the land actually partitioned accordingly.

Wherefore, the judgment is reversed on the original and cross-appeals, without any judgment for costs to either party in this court; but all the costs in the court below subject to the final determination of the case.